### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT

I, Task Force Officer ("TFO") Scott Alicea-Bailey, being duly sworn, depose and state as follows:

### Agent Background

1.     I have been employed by the Southbridge Police Department for over 20 years, where I have served as a Detective for over 15 years. I am a graduate of the full-time Municipal Police Academy in Boylston, Massachusetts. In addition to this training and the annual in-service training that I attend, I have received approximately 600 hours of specialized training in drug enforcement sponsored at both the municipal and federal levels, to include a two-week Basic Narcotics course sponsored by the Massachusetts Criminal Justice Training Council.

2.     In March 2015, I was assigned as a TFO to the Tactical Diversion Squad (TDS) of the Drug Enforcement Administration (DEA) stationed in Worcester, Massachusetts. The primary mission of TDS is the enforcement laws prohibiting the trafficking of diverted pharmaceutical drugs and chemicals. As a DEA TFO, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General.

3.     I have participated in numerous federal drug trafficking investigations of individuals engaged in the illegal distribution of controlled dangerous substances. In addition, I have been involved in the execution of numerous search and seizure warrants, made arrests for violations of state and federal laws, and authored supporting affidavits. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge

regarding major narcotics trafficking organizations. I have also reviewed recorded conversations, telephone and drug records. Through my training and experience, I have become familiar with how illegal drugs are imported, transported, stored and distributed, and the methods of payment for such drugs. I have also become familiar with how narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity, and to protect their operations, members, narcotics, and narcotics proceeds.

4.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in communicating with potential clients and co-conspirators.

5.      Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities. Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I am familiar with the manner in which drug traffickers often

store drugs and drug proceeds in their residences and in storage sites commonly referred to as "stash houses."

### *Purposes of the Affidavit*

6.     I submit this affidavit in support of an application for a criminal complaint charging PETER SCHIEPERS ("SCHIEPERS") with possession with intent to distribute methamphetamine in violation of Title 21, United States Code, Section 841 (the "Charged Offense"). Based on the facts set forth in this affidavit, there is probable cause to believe that SCHIEPERS has committed the Charged Offense.

7.     I also submit this affidavit in support of an application for a search warrant for the following premises:

>     a.    <u>Target Location</u>: 41 Allston Street, Apartment #1, Boston, MA, which is accessed by the front door and then an immediate door at the left side of the entryway. The Target Location is believed to be SCHIEPERS' residence. The Target Location is further described in Attachment A, which is attached hereto and incorporated by reference herein.[1]

8.     The application seeks to seize evidence related to the Target Offense, as described in Attachment B, which is attached hereto and incorporated by reference herein.

9.     As a result of my personal participation in the investigation, review of reports

---

[1] Open-source real estate listings list the Target Location as a 4-bedroom apartment. Investigators have observed no other individuals at the location. Law enforcement database queries show two other individuals potentially associated with that address, neither of whom have a criminal history. During surveillance of packages being sent to the unit, there was one package addressed to another name at the same address. This leads investigators to believe that SCHIEPERS may have at least one roommate.

submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaint and warrant. Accordingly, I have not included every fact known to me and other law enforcement officers involved in this investigation.

## Probable Cause

### Purchase #1: SCHIEPERS Sold Methamphetamine to a Confidential Source on November 25, 2024

10.    On November 25, 2024, investigators met with a confidential source for the government ("CS").[2] The CS informed investigators about a source of supply for methamphetamine, and investigators directed the CS to set up a meeting with this supplier to conduct a controlled purchase of methamphetamine. The CS and the supplier communicated via Signal, an encrypted messaging application, to arrange a drug transaction. Those messages were contemporaneously shown to investigators. The supplier agreed to provide the CS with an ounce of crystal methamphetamine for $500 and a vial of Gamma Hydroxybutyrate (GHB), more

---

[2] The CS is cooperating with investigators after being charged with trafficking over 200 grams of crystal methamphetamine, possession of a class B substance and possession with intent to distribute a class B substance. The CS is cooperating in hopes of receiving leniency in sentencing. The CS has no other criminal history. Information provided by the CS has led to the identification of narcotics traffickers and the seizure of narcotics, and has supported search warrants and arrests in the past. The information provided by the CS has been corroborated to the extent possible and the CS is believed to be reliable.

commonly known as the "date rape drug"[3] for $50. In preparing for the purchase, the supplier told the CS that his source of supply would also attend the meeting.

11.     In anticipation of the meeting, investigators searched the CS for contraband or personal money and found $7 USD, which investigators held for the duration of the controlled buy. Investigators equipped the CS with audio recording equipment, and provided the CS $550 official advance funds ("OAF"). Investigators maintained surveillance on the CS as the CS drove to the meeting location, 71 Beacon Street in Boston, MA. When the CS arrived at the address, the CS met both with his initial supplier and an individual later identified as PETER SCHIEPERS.[4] During the meeting, SCHIEPERS sold the CS the ounce of methamphetamine and one vial of Butanediol (BDO), a GHB analogue, in exchange for $550 OAF.

12.     During the meeting, SCHIEPERS discussed using The Onion Router (TOR), an application that masks internet protocol (IP) addresses, for packages shipped via USPS.[5] SCHIEPERS also discussed his background in cyber-security. SCHIEPERS gave the CS his phone number (857-318-6386) to communicate with him directly for future purchases, but told the CS that all communications needed to be done via Signal, which is an encrypted messaging

---

[3] GHB has many chemical analogues, and was often referred to by the parties as simply "G".

[4] SCHIEPERS' identity was confirmed by matching the phone number supplied to the CS with the subscriber information, which was registered to a Peter Scheipers. Records from the registry of motor vehicles confirmed the individual observed by both the CS and investigators was Peter Scheipers. Those same RMV records listed SCHIEPERS' residential address as 41 Allston Street in Boston (the Target Location).

[5] As detailed below, SCHIEPERS shipped drug packages to the Target Location.

application. Based on my experience, I know that Signal is a popular application for drug dealers because it allows for messages to be permanently deleted after a short period of time.

13.     Immediately after the meeting ended, the CS met with investigators and turned over the suspected methamphetamine. Investigators sent the suspected methamphetamine to the DEA laboratory for testing and analysis. The results confirmed the substance to be 26.76 grams of 99% pure methamphetamine.

***Purchase #2: SCHIEPERS Sold the CS 111 Grams of Methamphetamine Inside the Target Location on December 16, 2024***

14.     At the direction of investigators, the CS set up another controlled purchase, this time for 4 ounces of methamphetamine. The CS and SCHIEPERS again spoke via Signal, agreed to meet on December 16, 2024, and arranged for the transaction to take place at SCHIEPERS' residence (the Target Location) in Allston, MA. This call was not recorded.

15.     In preparation for the meeting, investigators searched the CS for contraband and personal money and found $115 USD, which investigators held for the duration of the controlled buy. Investigators provided the CS with audio recording equipment and $1,600 of OAF to purchase the methamphetamine. Investigators followed the CS until the CS arrived at the Target Location. Once inside the Target Location, the CS asked SCHIEPERS if he had ketamine for sale, and SCHIEPERS replied that he did. SCHIEPERS offered to sell ketamine to the CS, and the CS asked if SCHIEPERS would provide a gram of ketamine on credit. SCHIEPERS agreed and gave the CS four ounces of suspected methamphetamine and one gram of ketamine in exchange for the $1,600 of OAF. While in the presence of the CS, SCHIEPERS portioned out the methamphetamine from a large bag, and used a scale to verify the weight of the methamphetamine. SCHIEPERS did the same with the ketamine, and said he was contemplating buying ketamine in bulk to reduce prices.

7

16.    The CS left the Target Location, proceeded immediately to meet with investigators and turned over the suspected methamphetamine and ketamine. The CS told investigators that SCHIEPERS lives on the first floor of the property, which is accessed by the front door and then an immediate door at the left side of the entryway. Investigators sent the suspected methamphetamine and ketamine to the DEA laboratory for testing and analysis. The results confirmed the suspected methamphetamine to be 111 grams of 100% pure methamphetamine. The results also confirmed the suspected ketamine to be approximately 0.751 grams of ketamine hydrochloride.

### Purchase #3: SCHIEPERS Went Directly From the Target Location to Meet with the CS to Supply Methamphetamine on January 22, 2025

17.    At the direction of investigators, the CS set up another controlled purchase from SCHIEPERS on January 22, 2025. The CS and SCHIEPERS corresponded by Signal in a mix of both text and audio calls in the presence of investigators, and agreed that the purchase would take place at a Starbucks—1304 Commonwealth Avenue in Allston—which is near the Target Location. The CS told SCHIEPERS that a friend would accompany the CS-1 on the purchase, however, that "friend" was actually an undercover task force officer (the "UC"). The CS and SCHIEPERS agreed that the CS would provide $1,150 as both payment for the ketamine that SCHIEPERS provided on credit on December 16, 2024, as well as for SCHIEPERS providing the CS with another ounce of methamphetamine and 1 liter of BDO.[6]

18.    In preparation for the meeting, investigators searched the CS for contraband and personal money with negative results, provided the CS with $1,150 of OAF to purchase the drugs

---

[6] The parties used the street name, G, which is short for GHB, in arranging for the sale.

and installed an audio/video recording device in the undercover vehicle. The CS and the UC arrived at the Starbucks, purchased coffees, and waited in the undercover vehicle outside for SCHIEPERS to arrive. Meanwhile, investigators observed SCHIEPERS leaving the Target Location and followed him until he arrived at the Starbucks, where he entered the undercover vehicle.

19.    Once inside the undercover vehicle, SCHIEPERS explained that he had run out of "BDO," which I understand to be Butanediol, an analogue of GHB. SCHIEPERS explained that he had purchased a gallon of BDO, which would be delivered in about 5 days. SCHEIPERS stated that he received the BDO in Chinese shampoo bottles delivered directly to the Target Location, and that he also used an application that allowed him to anonymously send some shipments to hotels and convenience stores nearby. The three discussed purchasing a large quantity of methamphetamine in the future, and SCHIEPERS said that he could guarantee a pound a week of methamphetamine going forward.

20.    The CS gave SCHIEPERS $600 for the ounce of methamphetamine and to pay for the ketamine previously supplied on credit, and SCHIEPERS gave the CS the ounce of suspected methamphetamine. SCHIEPERS left the undercover vehicle and investigators observed him return to the Target Location.

21.    The CS and the UC proceeded immediately to meet with investigators and turned over the suspected methamphetamine, as well as the $550 for the unpurchased BDO. Investigators sent the suspected methamphetamine to the DEA laboratory. The results confirmed the substance to be 27 grams of 100% pure methamphetamine.

***Purchase #4: SCHIEPERS Went Directly From the Target Location to Meet with the CS to Supply Methamphetamine on February 12, 2025***

22.     On February 12, 2025, the UC communicated with SCHIEPERS via the Signal to arrange purchase more methamphetamine and one liter of Butanediol from SCHIEPERS in a parking lot near the Target Location.

23.     In preparation for the meeting, investigators provided the UC with $2,800 of OAF to purchase the drugs and installed an audio/video recording device in the undercover vehicle. The UC arrived at the location and waited for SCHIEPERS.

24.     Shortly before they were set to meet, investigators observed SCHIEPERS leave the Target Location with a package under his arm and walk in the direction of the arranged meeting spot. Approximately one minute later, SCHIEPERS arrived in the parking lot and got into the undercover vehicle with the UC.

25.     Once inside the vehicle, SCHIEPERS told the UC that he only had four ounces of methamphetamine—as opposed to seven ounces that had been discussed beforehand—because a package had not yet arrived.

26.     The UC gave SCHIEPERS $1,900 in exchange for the methamphetamine and liter of BDO, and SCHIEPERS left the vehicle.

27.     Following the exchange, investigators observed SCHIEPERS walk to a nearby café, leave with some food and a drink, and return back to the Target Location.

28.     The UC then met with investigators and turned over the suspected methamphetamine and BDO, as well as $900 of unused OAF. Investigators sent the suspected methamphetamine to the DEA laboratory for testing and analysis. The results confirmed the suspected methamphetamine to be 113 grams of 99% pure methamphetamine. The results

confirmed that the suspected BDO to be 981 grams of Butanediol, which I understand to be an analogue of GHB, a Schedule 1 controlled substance.

### *Drug Traffickers' Use of Residences and Cell Phones Generally*

29.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences:

a.      Controlled substances and materials used to "cut" or dilute those substances.

b.      Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, and substances used to "cut" or dilute illegal narcotics.

c.      Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions, ledgers, text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds, bank records, money orders, wire transfers, cashier's checks, checkbooks, passbooks, certificates of deposit, vehicle rental receipts, credit card receipts, and receipts reflecting rental properties and/or storage units.

d.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information

for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books, planners, notes, ledgers, and telephone bills.

e.    Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry, precious metals such as gold and silver, precious gems such as diamonds, titles, deeds, monetary notes, registrations, purchase or sales invoices, and bank records.

f.    Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities. Similarly, codes to access cryptocurrency, which is often used by drug traffickers, are often stored in a safe location in residences.

g.    Labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

h.    Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal

telephone books, diaries, utility and telephone bills, bank statements, credit card
receipts, identification documents, and keys.

i.   Photographs, videos, or other records concerning controlled substances, proceeds
from the sales of controlled substances, or identities of coconspirators.

j.   Cellular telephones, and evidence that tends to identify the person having dominion
and control over the cellular telephone, such as electronic address books or contact
lists on the phone, call logs, saved text messages, saved usernames and passwords
and documents.

30.    Based on my training and experience, and the collective experience of other
investigators participating in this investigation, I know that traffickers of controlled substances
frequently maintain, at their residences, quantities of illicit drugs to maintain their ongoing drug
business. I also know that traffickers of controlled substances usually keep, in addition to drugs,
paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of
controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences
or stash locations. Based upon my training and experience, as well as the training and experience
of other law enforcement agents I have worked with, I am aware that it is generally a common
practice for drug traffickers to store drug-related paraphernalia in their residences for longer
periods of time than they keep drugs in their residences.

31.    Based upon my training and experience, as well as the training and experience of
other law enforcement agents I have worked with, I am aware that it is generally a common practice
for drug traffickers to maintain in their residences records relating to their drug trafficking
activities. Because drug traffickers in many instances will "front" (that is, sell on consignment)

13

controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period, regardless of whether they are physically in possession of drugs on the premises.

32.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

33.    Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds. Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of

such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

34.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes, hidden compartments, or other containers so that other individuals who enter their residence do not discover these materials.

35.    Many drug dealers receive their drugs through overnight parcels and keep mailing labels both used and unused in their residence for future use. Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers to pay for a continuing supply of drugs. Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

36.    During the course of searches of residences, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the residences. Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Charged Offense. Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys. Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping. Many documents and records are

largely innocuous, or at least are perceived as such, while many documents and records have other utility. For example, a person involved in the trade of illegal drug is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills. These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

37.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residences. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

38.     Based upon my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells,"

16

enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

39.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drugs typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a

cellular telephone. From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

40.    Additionally, I know that many drug traffickers often use cellular telephones to communicate quickly and economically with their suppliers and customers via the internet. I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online. Additionally, many cellular phones today have a GPS navigation device on the phone. Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

41.    Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.  Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

19

## UNLOCKING DEVICES USING BIOMETRIC FEATURES

42.    I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

43.    On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

44.    The passcode(s) that would unlock the device(s) located at the Target Location are not currently known to law enforcement. Thus, it may be useful to press the finger(s) of the user(s) of the device(s) found during the search of the Target Location to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to

20

access the data contained on those devices for the purpose of executing the search authorized by this warrant.

45.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of SCHIEPERS to the sensor of the devices or place the devices in front of his face for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

46.    The law enforcement agents will endeavor to search and seize only the computer equipment and cell phones which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B. If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

### SCHIEPERS' Use of His Residence (the Target Location) and Cell Phone

47.    There are good reasons that the above observations apply with particular force here.

48.    The above facts demonstrate that SCHIEPERS used the Target Location to run his drug business. As set forth in detail above, SCHIEPERS met with the CS inside of the Target Location where he weighed the methamphetamine prior to selling it to the CS. Investigators observed SCHIEPERS multiple times both leaving the Target Location prior to controlled purchases and returning back to the Target Location following the controlled purchases.

Additionally, SCHIEPERS stated that he had drugs shipped directly to the Target Location hidden in Chinese shampoo bottles.

49.    As described above, SCHIEPERS also used cellular telephones to communicate with the CS and UC to arrange drug purchases.

## CONCLUSION

WHEREFORE, I submit that there is probable cause to believe that on February 12, 2025, PETER SCHIEPERS distributed 50 grams or more of methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii), and that evidence of that offense, described more fully in Attachment B, will be found in the Target Location, described more fully in Attachment A.

Respectfully submitted,

Scott Alicea-Bailey, Task Force Officer
Drug Enforcement Administration

Sworn via telephone in accordance with Fed R. Crim. P. 4.1 on March ___10___, 2025

10:32 a.m.

Honorable David H. Hennessy
United States Magistrate Judge

22

*ATTACHMENT A – Premises to be Searched*

**41 Allston Street, Apt. 1, Boston, Massachusetts** (the "Target Location") is a first-floor apartment within the building located at 41 Allston Street, a yellow three-story, multi-unit building. The building contains two addresses: Apartments 1 & 2, which share a common entry into the building. The Target Location is on the first floor, with an entrance just to the left of the front door pictured below. The building is yellow in color with one exterior gate providing access to a central walkway to the front door of the building. A photograph of the exterior of the Target Location is below.



***ATTACHMENT B***

1.      All records and tangible objects in whatever form, from November 1, 2024 to present, that constitute evidence, fruits, or instrumentalities of violations of the Charged Offense:

a.      Controlled substances, including but not limited to methamphetamine, ketamine, GHB and its analogues, and materials used to "cut" or dilute those substances.

b.      Books, records, receipts, notes, ledgers, and other papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers or relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, photographs, telephone address books; planners; notes; ledgers; prescriptions; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

c.      Cash, currency, and records relating to drug trafficking activity income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; monetary notes; registrations; purchase or sales invoices; and bank records.

24

d.    Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

e.    Items of personal property that tend to identify the person(s) in control, or ownership of the target vehicle. Such identification evidence is typical of the articles people commonly maintain in their vehicles, such as mail, registration documents, vehicle maintenance receipts, bank receipts, credit card receipts, identification documents, and keys.

2.    Cellular telephones used by SCHIEPERS and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking located in the memory of any mobile telephone, including but not limited to:

a.    Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b.    Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.    Text messages both sent to and received by the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

25

d.  Social media and other messaging platforms, including Signal, that can be used to communicate with others;

e.  Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

f.  GPS data;

g.  Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.  Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

i.  All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.  Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the execution of the search of the Target Location described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the Target Location to the sensor of the subject device and/or to hold the device in front of their faces.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## <u>DEFINITIONS</u>

For the purpose of this warrant:

1. "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

2. "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

3. "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

4. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

5. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

6. "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

## RETURN OF SEIZED COMPUTER EQUIPMENT

If the owner of the seized computer equipment requests that it be returned, the government will attempt to do so, under the terms set forth below. If, after inspecting the seized computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.